SHUANGYANG LI
8 Elliot Road
Great Neck, NY 11021
Tel: 718-288-8296
E-Mail: gx8285@yahoo.com

## IN THE UNITED STATES
## COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| SHUANGYANG LI, | : | |
| Plaintiff, | : | |
| | : | |
| - vs - | : | |
| | : | |
| U.S. CUSTOMS AND BORDER PROTECTION, | : | Court No.: |
| JANET YELLEN, SECRETARY OF THE TREASURY, | : | |
| UNITED STATES DEPARTMENT OF THE TREASURY, | : | Hon. Judge: |
| UNTIED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### COMPLAINT

NOW COMES the Plaintiff, Shuangyang Li, avers as follows in support of his appeal from the U.S. Department of the Treasury's denial of credits for questions on the April 27, 2022 Customs Broker License Exam resulting in denial of a Customs Broker License.

I.    **JURISDICTION AND STANDING**

1. This Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S. §1581(g)(1), 19 U.S. §1641(e)(1) & (b)(2) and 19 C.F.R. §111.17(c).

2.    Plaintiff Shuangyang Li is an adult individual, residing at 8 Elliot Road, Great Neck, NY 11021 and has standing to maintain this action pursuant to 28 U.S. §2631(g)(1), which reads in pertinent part:

(g)(1) A civil action to review any decision of the Secretary of the Treasury to deny a customs broker's license under section 641(b)(2), ... , may be commenced in the Court of International Trade by the person whose license or permit was denied or revoked.

## II.    THE CUSTOMS BROKER LICENSE EXAM

3.    On April 27, 2022, Plaintiff took the Customs Broker License Exam.

4.    On May 10, 2022, Plaintiff was notified that he had obtained a score of 70.00% on the Exam, falling short of the required minimum passing score of 75%. A copy of the letter from U.S. CBP enclosing the score report is annexed hereto as **Exhibit A**.

5.    Subsequently, on June 8, 2022, Plaintiff initiated his initial appeal to the Secretary of the Treasury, as affirmed by the U.S. Customs and Border Protection, within the stipulated 60-day period as per 19 CFR §111.17(c).

6.    Despite the appeal, on March 3, 2023, the Secretary of the Treasury upheld the Customs Service's decision, maintaining the denial of additional credit to the exam score. The final score remained at 70.00%, and Plaintiff was notified that he had not met the required minimum passing score of 75%. A copy of the first appeal denial letter is annexed hereto as **Exhibit B**.

7.    On March 27, 2023, Plaintiff submitted the second appeal to the Secretary of the Treasury.

8.    On October 3, 2024, the Secretary of the Treasury made adjustments, crediting Questions 13, 22 and 46. Despite these adjustments, Plaintiff's revised score stood at 73.75%, still falling short of the necessary minimum passing score of 75.00%. A copy of the second appeal denial letter is annexed hereto as **Exhibit C**.

9.    In reaffirming Plaintiff's argument, Plaintiff now submits further clarification and arguments for questions 11, 14, 37, 38, 42, 44, 54 and 69, seeking a fair and thorough reconsideration of Plaintiff's Customs Broker Exam results.

## III.    QUESTIONS AND ARGUMENTS

==Argument for Question 11: Unfair Ambiguity Due to Multiple Correct Answers==

**Question 11:** The following statements are all true EXCEPT:

- **A.** Unless covered by a warehouse entry, articles in examination packages that have not been exported, destroyed, or properly marked by the importer within 30 days shall be sent to general order (GO) stores for disposition.
- **B.** An imported article, which is not a good of a North American Free Trade Agreement (NAFTA) or United States-Mexico-Canada Agreement (USMCA) country, that is used in the U.S. in manufacture which results in an article having a name, character, or use differing from that of the imported article, will be within the principle of the decision in the case of United States v. Gibson-Thomsen Co., Inc., 27 C.C.P.A. 267 (C.A.D. 98). These articles are considered substantially changed by the manufacturer and do not require country of origin marking at the time of importation. However, the outermost containers of the imported articles shall be properly marked.
- **C.** Unless excepted by law, the English name of the country of origin of an article of foreign origin imported into the U.S. shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article will permit, at the time of importation into the Customs territory of the U.S.
- **D.** All marking requirements applicable to articles of foreign origin imported directly from a foreign country into the U.S. apply to similar articles of foreign origin that are imported into a U.S. possession outside its Customs territory and reshipped to the U.S.
- **E.** Without additional time allowed by the Center director, if an importer does not properly mark or redeliver all merchandise previously released to the importer within 45 calendar days from the date of the notice of redelivery, the port director shall demand payment of liquidated damages incurred under the bond in an amount equal to the entered value of the articles not properly marked or redelivered.

**CBP Answer: E**

**Examinee's Answer: D**

**Argument:**

Your Honor, I respectfully request reconsideration of Question 11 on the basis that the question includes **multiple plausible correct answers** due to ambiguities in the customs marking regulations under **19 CFR Part 134**. Both **Answer Choices E and C** can reasonably be interpreted as incorrect based on specific provisions in **19 CFR 134.54(a)** and **19 CFR 134.45(b)**, creating an unfair situation for examinees.

### I. Conflicting Regulatory Interpretations for Answer Choice E

1. **Interpretation of 19 CFR 134.54(a)**:
   a. CBP's position is that **Answer Choice E** is the only incorrect statement, referencing **19 CFR 134.54(a)**, which provides that importers have 30 days from the date of a redelivery notice to comply with marking requirements or face liquidated damages. However, **134.54(a)** also allows additional time at the discretion of the Center director.
   b. The conditional language in **134.54(a)** makes it unclear whether the 30-day period is absolute or subject to exceptions based on discretion. This discretionary clause creates an ambiguity, making it reasonable to question whether Answer E is universally false.

3

## II. Alternative Reasonable Interpretation for Answer Choice C

1.  **Interpretation of 19 CFR 134.45(b)**:
    a.  **Answer Choice C** states that the country of origin must be marked in English without exception. However, **19 CFR 134.45(b)** permits specific abbreviations and alternative spellings that unmistakably indicate the country of origin, such as "Gt. Britain" for "Great Britain" or "Brasil" for "Brazil."
    b.  These permitted variations contradict the rigid interpretation suggested by Answer Choice C, as abbreviations and alternative spellings are exceptions that allow non-standard forms. This exception reasonably calls into question whether Answer C is also inaccurate.

2.  **Plausible Grounds for Multiple Incorrect Answers:**
    a.  Given that both **Answer E** and **Answer C** could reasonably be interpreted as incorrect based on their respective regulatory language, this question includes more than one plausible answer. Penalizing examinees for identifying either as incorrect introduces unfair ambiguity and inconsistency in examination standards.

## III. Fairness and Consistency in Examination Standards

Examinations should provide clarity, particularly when assessing nuanced regulatory knowledge. The ambiguous language in Question 11 creates an unreasonable expectation that examinees discern one exclusive answer when the regulations support multiple interpretations.

## IV. Conclusion

In light of the ambiguities in both **Answer Choices E and C**, I respectfully request that the Court either grant credit for both answers or invalidate this question for all examinees. This adjustment would uphold fairness and align with examination standards that prioritize clarity and consistency.

Thank you for your consideration.

**Argument for Question 14: Insufficient Information to Determine the Penalty Amount**

**Question 14:** For General Order (GO) merchandise regularly landed but not covered by a permit for its release, it is authorized to remain at the place of unlading until the 15th calendar day after landing. If an entry has not been made for the merchandise, the owner, operator of an imported vehicle, or agent must notify CBP no later than 20 calendar days after landing; otherwise, a monetary penalty will be assessed. What is the greatest penalty amount per bill of lading that can be assessed?

- **A.** $1,000.00
- **B.** $1,500.00
- **C.** $2,000.00
- **D.** $3,000.00
- **E.** $5,000.00

**CBP Answer: A**

**Examinee's Answer: E**

**Argument:**

Your Honor, I respectfully request reconsideration of Question 14, as it lacks essential information required to accurately determine the correct penalty amount under **19 CFR 123.10**. The question does not specify the value of the merchandise in question, which is critical to calculating the maximum penalty. This missing information creates ambiguity and makes it impossible for examinees to confidently select a correct answer.

## I. Lack of Essential Information in Question 14

1. **Penalty Amount Depends on Merchandise Value**:
   a. **19 CFR 123.10** states that, for General Order (GO) merchandise not covered by a release permit, a penalty of up to **$1,000 per bill of lading** may be assessed. However, if the value of the merchandise is less than $1,000, the penalty should be **equal to the value of the merchandise**.
   b. The regulation specifies that the penalty shall be the lesser of $1,000 or the merchandise's value. Without knowing the value of the goods, examinees cannot determine whether the penalty cap applies at $1,000 or at a lower amount, depending on the merchandise's value.
2. **Ambiguity Due to Missing Value of Merchandise**:
   a. The question's omission of the merchandise value introduces significant ambiguity, leaving examinees unable to assess the appropriate penalty accurately. Regardless of the fact that the answer choices list values above $1,000, the value of the merchandise is missing, which is an essential element of knowing the penalty amount.

## II. Exam Fairness and Clear Information Standards

1. **Insufficient Data to Select One Correct Answer**:
   a. The Customs Broker License Examination is expected to provide sufficient information for examinees to arrive at one unambiguous correct answer. The lack of information regarding the merchandise's value fails to meet this standard, as it prevents examinees from fully applying the penalty rule in **19 CFR 123.10**.
   b. Therefore, the fact that that CBP is denying the appeal because answer choice of $1,000 is listed is not reasonable and does not change the fact that the question is missing essential information needed to completely answer the question.
2. **Request for Judicial Consideration Based on Fairness**:
   a. Courts have supported examinees in situations where questions lack essential information, particularly when regulatory details are omitted. In this case, the question should provide the merchandise value.

## III. Conclusion

Due to the missing information necessary to determine the penalty, I respectfully request that the Court grant credit and invalidate this question. This adjustment would uphold examination standards by ensuring that questions provide all required information to identify a clear answer.

Thank you for your consideration.

==Argument for Question 37: Exclusion of Explanatory Notes (ENs) Creates Ambiguity==

**Question 37:** What is the CLASSIFICATION of a foldable ping-pong game table consisting of an undersized ping-pong table surface? The object measures 5 feet (ft) long by 3 ft wide by 2.5 ft high when unfolded, and includes two paddles, a mesh net, and two ping-pong balls.

- **A.** 9503.00.0073
- **B.** 9504.20.6000
- **C.** 9504.30.0040
- **D.** 9506.40.0000
- **E.** 9506.99.6080

**Correct Answer: D**

**Examinee's Answer: E**

**Argument**:

CBP has denied my appeal for this question while referring to Explanatory notes. CBP's answer relied on **EN 9506(B)(4)** to equate "ping-pong" with "table-tennis," but ENs are not <u>required</u> resources for the CBLE. Without access to ENs, examinees cannot reasonably make this connection.

1. **Reliance on Non-Accessible ENs**: Examinations limit resources to HTSUS, CFR and few other regulations, but not the Ens - requiring knowledge of ENs creates an unfair burden on examinees.

I respectfully request the Court to grant credit for an alternative answer, such as **E**.

==Argument for Question 38: Essential Character Under GRI 3(b) vs. GRI 3(c)**==

**Question 38**: What is the CLASSIFICATION of a book of crossword puzzles? The book measures 6 inches (in) by 9 in, is softcover, and contains 75 pages of pre-printed crossword puzzles labeled as appropriate for adults.

- **A**. 4901.99.0093
- **B**. 4901.99.0092
- **C**. 4903.00.0000
- **D**. 9503.00.0090
- **E**. 9503.00.0013

Correct Answer: D

**Examinee's Answer: A**

**Argument:**

Your Honor, I respectfully request reconsideration of Question 38 based on the proper application of the General Rules of Interpretation (GRI). Specifically, the classification of this crossword puzzle book should be determined by identifying the **essential character** of the item under GRI 3(b) rather than defaulting to GRI 3(c). Examining the item's essential character is critical here, as the book format and printed content create ambiguity as to whether the item should be classified as a "book" under Chapter 49 or as a "puzzle" under Chapter 95.

## I. Application of GRI 3(b) to Determine Essential Character

1. Determining Essential Character as a Book or Puzzle:

   - GRI 3(b) states that when an item could be classified under multiple headings, classification should be based on the essential character. In this case, the item is a book containing pre-printed crossword puzzles, measuring 6 by 9 inches with 75 pages and a softcover, which strongly suggests its primary nature as a book.

   - The essential character of this item could reasonably be interpreted as printed material intended for reading and completion, aligning with goods classified under Chapter 49. The presence of puzzles within the book does not negate its book format, which examinees could reasonably view as its essential character.

2. Avoiding Unnecessary Application of GRI 3(c):

   - GRI 3(c) is a last-resort rule that applies only if GRI 3(a) and 3(b) cannot yield a clear classification. By using GRI 3(b) to determine the essential character of the crossword puzzle book, it is unnecessary to resort to GRI 3(c), which would simply classify the item by the heading appearing last in numerical order.

   - Relying on GRI 3(c) ignores the primary purpose of the book as printed material and disregards the straightforward determination under GRI 3(b).

## II. Fairness and Clarity in Examination Standards

1. Reasonable Grounds for Alternative Classification:

   - Without explicit guidance in the HTSUS equating a book of crossword puzzles to "puzzles of all kinds," examinees have grounds to interpret the book format and printed material as the essential character. Given the item's structure, Chapter 49 is a reasonable choice under GRI 3(b).

   - Penalizing examinees for not selecting Chapter 95 under GRI 3(c) undermines the clear intent of GRI 3(b) to classify goods based on essential character.

## III. Conclusion

I respectfully request that the Court grant credit for Question 38 based on the essential character under GRI 3(b). This approach ensures fair testing standards by focusing on the item's nature as printed material rather than defaulting to GRI 3(c) without proper analysis.

<mark>Argument for Question 42: Ambiguity in Classification Due to Lack of Guidance on Common Name vs. Species Name</mark>

**Question 42:** Best Seafood Import Company is entering a product called "Bonito del Norte" from Spain. The fish is in pieces, packaged in glass jars, and is invoiced as "Bonito del Norte, White Tuna in Olive Oil." The documents provided include a National Oceanic and Atmospheric Administration (NOAA) Form 370 "Fisheries Certificate of Origin," which lists "Thunnus Alalunga in Oil" under the "Description of Fish" section, and a Captain's Statement stating that no dolphins were harmed during the catch. What is the CLASSIFICATION of this product?

- **A.** 0302.31.0000
- **B.** 1604.14.1091
- **C.** 1604.14.2259
- **D.** 1604.14.7000
- **E.** 1604.19.2500

**CBP Answer: B**

**Examinee's Answer: D**

**Argument:**

Your Honor, I respectfully request reconsideration of Question 42 due to the ambiguity surrounding the classification of the fish product under either its **common name** (Bonito) or its **species name** (Thunnus alalunga). The question does not clarify which naming convention takes precedence, leading to multiple plausible answers based on the regulatory language.

**I. Lack of Clear Guidance on Naming Conventions in Classification**

1. **Ambiguity Between Common and Species Name:**
    a. The imported product is labeled "Bonito del Norte" in the invoice, which suggests it could be classified as **bonito**. However, the NOAA certificate uses the species name **Thunnus alalunga**, which would classify it as **albacore tuna** rather than bonito.
    b. Neither the Chapter 16 notes nor the GRI explicitly instruct whether "Bonito del Norte" should be classified according to its common name or the species name, creating an interpretive challenge for examinees.
2. **Reasonable Grounds for Selecting Answer Choice D:**
    a. **Answer Choice D (1604.14.7000)** applies to **Bonito (Sarda spp.) in oil**. Based on the common name, "Bonito del Norte" naturally suggests classification as a type of bonito, making it reasonable to select Answer D.
    b. The classification under **1604.14.10** (Answer Choice B) presumes the fish should be classified as **tuna** based on the species name **Thunnus alalunga**, but without clear guidance on

naming convention precedence, it is equally reasonable to classify it under the common name.

### II. Application of GRI and Fairness in Examination Standards

1.  **GRI Interpretation and Essential Character**:
    a.  **GRI 1** states that classification should be based on the terms of the headings and any relevant chapter notes. Since there is no directive about using the common versus species name in the HTSUS or chapter notes, applying the common name aligns with a logical interpretation of the item's essential character as labeled.
    b.  **GRI 3(b)** further supports focusing on the essential character. The common name "Bonito del Norte" more closely aligns with the nature of the product as presented to consumers and supports classification under **1604.14.7000**.

2.  **Fairness and Consistency in Exam Standards**:
    a.  Ambiguity around naming conventions creates confusion, and penalizing examinees for interpreting the product's label based on the common name, which is consistent with consumer-facing information, is unfair.
    b.  Courts have recognized the need for exam questions to provide clear guidance, especially when regulatory language leaves room for interpretation.

### III. Conclusion

Due to the ambiguous guidance regarding classification by common or species name, I respectfully request that the Court consider granting credit for **Answer Choice D** based on a fair interpretation of the product as labeled. This adjustment would align with examination fairness standards by acknowledging the lack of clarity on naming conventions.

Thank you for your consideration.

**Argument for Question 44: Lack of Definition for "Digital Still Image Video Camera"**

**Question 44:** What is the CLASSIFICATION for a 1,080 pixel high-definition digital camera with an interchangeable lens and three-inch liquid crystal display (LCD) that captures both still images and moving images?

- **A.** 8519.89.3000
- **B.** 8525.80.4000
- **C.** 8525.80.5015
- **D.** 8525.80.5050
- **E.** 8527.12.0000

**Correct Answer: B**

**Examinee answer: D**

**Argument:**

"Digital still image video camera" is undefined in HTSUS, making it unclear if "video camera" should primarily refer to video functions.

1. **Interpretation Based on "Digital Still Image"**: The term could reasonably be interpreted to mean still-image focus, leading to a different classification if "video" is secondary.

## I. Analysis of Answer Choices and Corresponding Ambiguities

Comparing headings, 8525 is the best one:
- 8519 - Sound recording or reproducing apparatus.
- **8525** - Transmission apparatus for radio-broadcasting or television, whether or not incorporating reception apparatus or sound recording or reproducing apparatus; television cameras, digital cameras and video camera recorders --> Television cameras, digital cameras and video camera recorder.
- 8527 - Reception apparatus for radiobroadcasting, whether or not combined, in the same housing, with sound recording or reproducing apparatus or a clock

B, C, and D are all the same subheadings.
Under 8525.80 →
- Television Cameras
- Digital still image video cameras
- Other

Television cameras are for video. Digital "still image" cameras seem to be for still images only. This leaves "other" as the best option (8525.80.50) →
- Camcorders
- Other

Camcorders are also for mostly video, therefore, the best answer is "Other" (8525.80.5050). D is the best answer and I should get credit for it.

## II. Conclusion

I respectfully request credit based on the undefined term creating plausible alternative answers.

**Argument for Question 54: Multiple Plausible Correct Answers Based on Ambiguities in Trademark Recordation Requirements**

**Question 54:** The new owner of a previously recorded trademark would like to continue the recordation with CBP. The trademark is for an item with a gray market counterpart the owner would like protection against based on physical and material differences. The following are all actions the owner must take to continue the recordation EXCEPT:

- **A.** Pay a fee of $80.00, which covers all trademarks included in the application
- **B.** State the basis for the asserted physical and material differences with particularity and competent evidence, with summaries of the differences for publication in the Customs Bulletin
- **C.** Identify any parent or subsidiary company or other foreign company under common ownership (only for those with aggregate ownership of more than 40% of the business entity) and common control, which uses the trademark abroad
- **D.** Describe any time limit on the rights of ownership transferred

- **E.** Submit a status copy of the certificate of registration certified by the U.S. Patent and Trademark Office showing the title to be presently in the new owner's name

**CBP Answer: C**

**Examinee's Answer: A**

**Argument:**

Your Honor, I respectfully request reconsideration of Question 54, as the question includes multiple plausible correct answers. Each of the options (A, C, D, and E) contains ambiguities or inaccuracies when compared to the relevant regulatory requirements under **19 CFR Part 133**. These ambiguities make it difficult to identify a single, exclusive answer.

### I. Analysis of Answer Choices and Corresponding Ambiguities

1. **Answer Choice A (Fee Requirement) Ambiguity**:
    a. **19 CFR 133.3(b)** requires a fee of **$190 for each trademark** to be recorded or renewed, not a single fee of $80 covering multiple trademarks. This discrepancy makes **Answer Choice A** inaccurate according to the correct fee structure.
    b. As the new owner of a previously recorded trademark seeks to continue the recordation, the required fee of $190 per trademark would apply, making Answer A a valid choice as an incorrect statement.
2. **Answer Choice C (Ownership Percentage Requirement)**:
    a. **19 CFR 133.2(d)** requires disclosure of any parent, subsidiary, or other foreign companies with common ownership of **more than 50 percent** of the business entity, not the 40 percent specified in Answer Choice C.
    b. This discrepancy in the ownership threshold makes Answer C a reasonable choice as the incorrect statement, which aligns with CBP's answer key. However, given the regulatory language, it is equally reasonable for examinees to select Answer C based on this inconsistency.
3. **Answer Choice D (Time Limit on Ownership Rights)**:
    a. Answer Choice D requests that the owner "describe any time limit on the rights of ownership transferred." However, **19 CFR 133** does not explicitly require information on time limits as part of the trademark recordation process, making this requirement inaccurate and irrelevant to the question's context.
    b. The ambiguity here reasonably leads examinees to interpret Answer D as another incorrect option.
4. **Answer Choice E (Status Copy Requirement)**:
    a. **19 CFR 133.3(a)(1)** requires submission of **five copies** of the status copy of the certificate of registration from the U.S. Patent and Trademark Office (PTO), not a single "status copy" as Answer Choice E suggests.
    b. The discrepancy in the number of copies required creates an inconsistency, making Answer E another reasonable selection as the incorrect statement.

### II. Fairness and Consistency in Examination Standards

1. **Multiple Plausible Answers Due to Regulatory Ambiguities**:

a. Given the conflicting regulatory details in 19 CFR Part 133, four of the answer choices (A, C, D, and E) could reasonably be interpreted as incorrect based on fee amounts, ownership percentage requirements, time limit information, and status copy quantity.

b. Penalizing examinees for selecting any of these choices undermines fairness, as the inconsistencies create ambiguity around which answer is exclusively incorrect.

2. **Request for Judicial Review Based on Fairness:**

a. Courts have previously supported examinees when multiple answers are reasonable due to ambiguous or conflicting regulatory language. In this case, the lack of clear guidance on a single incorrect answer supports granting credit based on examination fairness.

### III. Conclusion

In light of the ambiguities in Answer Choices A, C, D, and E, I respectfully request that the Court grant credit for **Answer Choice A** or alternatively for any of the plausible incorrect answers. This adjustment would uphold fairness and consistency in examination standards by recognizing the multiple plausible interpretations.

Thank you for your consideration.

**Argument for Question 69: Absence of Correct Answer Due to Ambiguity in Procedural Steps**

**Question 69:** In the case of merchandise covered by a finding under 19 CFR 12.42(f), the Commissioner of CBP advises the port director that the proof furnished under 19 CFR 12.43 does not establish the admissibility of the merchandise, and no proof has been timely furnished. What will the port director do with the merchandise for violation of 19 USC 1307?

- **A.** Export the merchandise
- **B.** Detain the merchandise
- **C.** Admit the merchandise
- **D.** Seize the merchandise
- **E.** Add a 25% duty to the merchandise

**CBP Answer: D**

**Examinee's Answer: B**

**Argument:**

Your Honor, I respectfully request reconsideration of Question 69 on the grounds that the correct answer is absent from the provided choices. Based on **19 CFR 12.44(a)**, the appropriate course of action in this scenario is to **exclude and ultimately destroy** the merchandise, as opposed to seizing it or simply detaining it. Since destruction is not listed as an option, the question lacks a clear and correct answer.

### I. Analysis of Regulatory Procedure in 19 CFR 12.44(a)

1. **Regulatory Procedure for Merchandise Deemed Inadmissible:**

a. **19 CFR 12.44(a)** outlines that, if merchandise is subject to a finding under **19 CFR 12.42(f)** and the Commissioner determines that proof of admissibility has not been furnished in a timely manner, the merchandise will be **excluded from entry**. The regulation states that, after

exclusion, the merchandise will be deemed **abandoned and destroyed** if not exported or if no protest is filed within 60 days.

    b. The steps outlined in **19 CFR 12.44(a)** emphasize destruction as the final outcome for inadmissible goods in this context, yet "destruction" is absent from the answer choices.

2. **Procedural Ambiguity and Sequence of Actions:**

    a. Upon determining inadmissibility, **the first step** for the port director is to notify the importer in writing that the merchandise is excluded. If, after 60 days, the merchandise is not exported or protested, it will be **deemed abandoned and destroyed**.

    b. Given this procedural flow, "detention" or "seizure" are not explicitly required steps once a finding is issued, and exclusion followed by destruction is the proper course.

## II. Absence of Correct Answer and Unfair Ambiguity

1. **No Correct Answer Option for "Destruction":**

    a. The question does not present "destruction" as an option, despite the fact that this is the ultimate disposition for merchandise that fails to establish admissibility under 19 USC 1307 and 19 CFR 12.44(a).

    b. **Answer Choice D (Seizure)** and **Answer Choice B (Detain)** are both procedurally inaccurate, as neither fully aligns with the steps described in **19 CFR 12.44(a)**, where destruction follows exclusion rather than seizure or detention.

    c. Additionally, both detention and seizure involve merchandise being physically withheld by customs authorities. To a layperson, both actions may seem like "taking control" of the goods by the government agency, making the difference less obvious. Requiring the examiner to distinguish detention and seizure will unfairly call upon his legal judgment on complicated legal jargons, which is beyond the scope and purpose of the exam.

2. **Unfair Penalty Due to Absence of Clear Answer:**

    a. By omitting the correct procedural outcome of destruction, examinees are unfairly penalized for selecting answers that do not accurately reflect the final disposition outlined in the regulation.

    b. Penalizing examinees for selecting detention or exclusion, when neither accurately reflects the regulatory language, undermines examination fairness and consistency.

## III. Conclusion

In light of the absence of the correct answer of "destruction," I respectfully request that the Court grant credit for this question or invalidate it for all examinees. This adjustment would uphold fair examination standards by acknowledging the omission of the correct answer in the options provided.

Thank you for your consideration.

## IV.     <u>PRAYER FOR RELIEF</u>

    In a spirit of respect and earnestness, Plaintiff kindly seeks due consideration and credit for questions 11, 14, 37, 38, 42, 44, 54 and 69 on the Customs Broker License Exam.

Your thoughtful review and acknowledgment of the merit in this request would be deeply appreciated.

Respectfully Submitted,

Dated: November 21, 2024
       Great Neck, NY

Shuangyang Li, Plaintiff
8 Elliot Road
Great Neck, NY 11021
Tel: 718-288-8296
gx8285@yahoo.com

CERTIFICATE OF SERVICE

On November 22, 2024, I, Shuangyang Li, deposited a copy of the attached Summons

and Complaint and attached pages and exhibits via certified mail with return receipts:


U.S. Customs and Border Protection
1300 Pennsylvania Avenue, NW
Washington, DC 20229


Janet Yellen, Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC 20220


Justin R. Miller
Attorney in Charge
International Trade Field Office
Commercial Litigation Branch
U.S. Department of Justice
26 Federal Plaza
New York, NY 10278


Date: November 21, 2024


Shuangyang Li, Plaintiff
8 Elliot Road
Great Neck, NY 11021
Tel: 718-288-8296
E-Mail: gx8285@yahoo.com

# EXHIBIT A



1300 Pennsylvania Avenue NW
Washington, DC 20229

**U.S. Customs and Border Protection**

May 10, 2022

Shuangyang Li
8 Elliot Rd
Great Neck, NY 11021-1504 US

Dear Shuangyang Li:

This letter is to advise you of the results of your Apr 27, 2022 Customs Broker License Examination. Your score is 70.00 percent. The minimum passing score is 75.00 percent.

You may submit a written appeal of your score to U.S. Customs and Border Protection. In your appeal, you must submit a compelling argument in your own words why your answer is better than the official answer, or why the appealed question has no possible correct answer.

Your appeal package must be structured as follows:

- A cover letter stating your exam payment receipt number (e.g.: 3001-401312345), name and address, date and location of the exam (e.g.: Dallas, Los Angeles), and a list of the specific question(s) you are appealing.
- A copy of this letter.
- A copy of your answer sheet.
- The questions that you are appealing.

Requirements for appealed questions:

- Each appealed question must be presented in its entirety. Follow each question with the argument that supports your appeal for that particular question.

- Each question appealed must be presented separately, i.e., you must begin each appealed question on its own piece of paper. Your argument may begin on the same page as the question appealed.
- Each page must contain your name, exam date and the question number appealed (e.g.: Q 24).

Your appeal package will be denied if it is incomplete or untimely. You will not receive credit for a question if it:

- Does not provide a compelling argument.
- Argues for an answer you did not select on the answer sheet.

Please submit your appeal electronically to brokermanagement@cbp.dhs.gov with the subject line "Exam Appeal." If submitted electronically, your appeal package must be contained in one PDF document. Electronic appeal submissions must be received no later than 11:59 PM Eastern Time the 60th day from the date of this letter.

Alternatively, appeals may be submitted via mail to the address below and must be postmarked no later than 60 days from the date of this letter.

> U.S. Customs and Border Protection
> Office of Trade
> Trade Policy and Programs
> 1331 Pennsylvania Ave NW
> Washington, DC 20229-1142

If you have any further questions, please contact the Broker Management Branch at CBP Headquarters at brokermanagement@cbp.dhs.gov.

Sincerely,

Sharolyn McCann
Director, Commercial Operations, Revenue and Entry Division
Trade Policy and Programs
Office of Trade
U.S. Customs and Border Protection

# U.S. CUSTOMS AND BORDER PROTECTION

## Customs Broker License Examination

### Score Report

Candidate Name:  Li, Shuangyang
Candidate ID:  CBLE00010220048
Registration ID:  418684017
Date:  04-27-2022

**Your Responses:**

| | | | |
|---|---|---|---|
| 1. A | 21. A | 41. C | 61. A |
| 2. C | 22. A | 42. D | 62. A |
| 3. D | 23. D | 43. C | 63. D |
| 4. A | 24. D | 44. D | 64. C |
| 5. A | 25. B | 45. D | 65. D |
| 6. B | 26. D | 46. E | 66. B |
| 7. D | 27. B | 47. C | 67. A |
| 8. C  *D* | 28. B | 48. A | 68. D |
| 9. C | 29. E | 49. D | 69. B |
| 10. D | 30. B | 50. E | 70. C |
| 11. D  *E* | 31. E | 51. B | 71. C |
| 12. B | 32. C | 52. A | 72. C |
| 13. E  *C* | 33. A | 53. B | 73. B |
| 14. E  *A* | 34. C | 54. A | 74. D |
| 15. B | 35. C | 55. B | 75. D |
| 16. C | 36. B | 56. B | 76. D |
| 17. B | 37. E | 57. E | 77. A |
| 18. D | 38. A | 58. C | 78. E |
| 19. C | 39. B | 59. A | 79. D |
| 20. B | 40. D | 60. A | 80. C |

*Please retain this Score Report. A copy of the Score Report must be provided with the CBP exam appeal should an examinee choose to appeal a broker exam question(s).*

# EXHIBIT B



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

March 3, 2023

Shuangyang Li
8 Elliot Rd
Great Neck, NY 11021-1504

Dear Shuangyang Li:

U.S. Customs and Border Protection has reviewed the appeal of your results for the April 27, 2022 Customs Broker License Exam. You submitted an appeal of questions 11, 13, 14, 22, 37, 38, 42, 44, 46, 54 and 69. Upon review of your appeal CBP was not able to grant credit for any of your appealed questions. Your arguments for questions 11, 13, 14, 22, 37, 38, 42, 44, 46, 54 and 69 have been denied in this appeal.

Based on this determination and including credit for any questions you may not have appealed but for which you were granted credit, your final score is 70.00 percent. A minimum score of 75.00 percent is required to pass the Customs Broker License Exam.

You may request a further review of the decision regarding your appeal by submitting arguments to the Executive Assistant Commissioner, Office of Trade, within 60 calendar days of the date of this letter. Only those exam questions originally submitted for appeal are eligible for further review.

Should you choose to request further review, please submit your appeal electronically to BrokerManagement@cbp.dhs.gov with the subject line "April 2022 1st Appeal". If submitted electronically, your appeal package must be contained in one PDF document. Electronic appeal submissions must be received no later than 11:59 PM Eastern Time on the 60th calendar day from the date of this letter.

Alternatively, appeals may be submitted via mail to the address below and must be postmarked no later than 60 calendar days from the date of this letter.

U.S. Customs and Border Protection
Executive Assistant Commissioner, Office of Trade
1331 Pennsylvania Ave NW
Washington, DC 20229-1142
Re: Customs Broker License Exam Appeals

If you have any questions regarding this notification, please do not hesitate to contact Broker Management Branch, at brokermanagement@cbp.dhs.gov with "First Appeal" in the subject line.

Sincerely,

Brandon Lord
Executive Director, Trade Policy and Programs
U.S. Customs and Border Protection, Office of Trade

# EXHIBIT C



1300 Pennsylvania Avenue, NW
Washington, DC 20229

OCT 0 3 2024

Shuangyang Li
8 Elliot Rd
Great Neck, NY 11021

Dear Shuangyang Li:

U.S. Customs and Border Protection (CBP) has reviewed your second appeal of questions 11, 13, 14, 22, 37, 38, 42, 44, 46, 54, and 69 on the April 2022 Customs Broker License Examination. Your final score is 73.75 percent. A score of 75 percent must be attained to pass.

CBP has granted credit for questions 13, 22, and 46. Your arguments for questions 11, 14, 37, 38, 42, 44, 54, and 69 have been reviewed; you did not receive credit for these questions. Analysis is enclosed.

If you have questions regarding these results, please do not hesitate to email the Broker Management Branch at brokermanagement@cbp.dhs.gov with "April 2022 2nd Appeal" in the subject line.

You may appeal this decision by filing an action in the Court of International Trade pursuant to 19 U.S.C. § 1641(e)(1) and 19 C.F.R. § 111.17.

Sincerely,

AnnMarie R. Highsmith
Executive Assistant Commissioner
Office of Trade
U.S. Customs and Border Protection

Enclosure

Analysis Enclosure
Page 1

Question 11:

The following statements are all true **EXCEPT**:

   A. Unless covered by a warehouse entry, articles in examination packages that have not been exported, destroyed, or properly marked by the importer within 30 days shall be sent to general order (GO) stores for disposition.
   B. An imported article, which is not a good of a North American Free Trade Agreement (NAFTA) or United States-Mexico-Canada Agreement (USMCA) country, that is used in the U.S. in manufacture which results in an article having a name, character, or use differing from that of the imported article, will be within the principle of the decision in the case of United States v. Gibson-Thomsen Co., Inc., 27 C.C.P.A. 267 (C.A.D. 98). These articles are considered substantially changed by the manufacturer and do not require country of origin marking at the time of importation. However, the outermost containers of the imported articles shall be properly marked.
   C. Unless excepted by law, the English name of the country of origin of an article of foreign origin imported into the U.S. shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article will permit, at the time of importation into the Customs territory of the U.S.
   D. All marking requirements applicable to articles of foreign origin imported directly from a foreign country into the U.S. apply to similar articles of foreign origin that are imported into a U.S. possession outside its Customs territory and reshipped to the U.S.
   E. Without additional time allowed by the Center director, if an importer does not properly mark or redeliver all merchandise previously released to the importer within 45 calendar days from the date of the notice of redelivery, the port director shall demand payment of liquidated damages incurred under the bond in an amount equal to the entered value of the articles not properly marked or redelivered.

The correct answer is E.

Analysis:

Appellant Shuangyang Li selected Answer Choice D, which is TRUE and therefore incorrect as provided in 19 CFR 134.12 of Customs regulations. While Appellant Li proffers no explanation for the selection of Answer Choice D, Appellant Li contends that Answer Choice C is FALSE because abbreviations are permissible under Customs Regulations. Answer Choice C is TRUE per 19 CFR 134.11, which provides that "Unless excepted by law, . . . every article of foreign origin (or its container) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit, in such a manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article . . ." While 19 CFR 134.45(b) states that abbreviations and variant spellings, "which unmistakably indicate the name of a country," and "which clearly indicate the English name of a country of origin," are acceptable, it does not render Answer Choice C as FALSE. Indeed, 19 CFR 134.45(b) further reiterates 19 CFR 134.11 (and Answer Choice C) by requiring abbreviations and variant spellings to "unmistakably" and "clearly" indicate the English name of a country of origin.

Analysis Enclosure
Page 2

The appeal for Question 11 is denied.

Analysis Enclosure
Page 3

Question 14:

For General Order (GO) merchandise regularly landed but not covered by a permit for its release is authorized to remain at the place of unlading until the 15th calendar day after landing. If an entry has not been made for the merchandise, the owner, operator of an imported vehicle or agent must notify CBP no later than 20 calendar days after landing, a monetary penalty will be assessed. What is the greatest penalty amount per bill of lading that can be assessed?

    A. $1,000.00
    B. $1,500.00
    C. $2,000.00
    D. $3,000.00
    E. $5,000.00

The correct answer is A.

Analysis:

This question is designated as a "Fines and Penalties" question. Answer Choice A is correct per 19 CFR 123.10. The pertinent paragraph of the answer citation states:

(a) Any merchandise or baggage regularly landed but not covered by a permit for its release shall be allowed to remain at the place of unlading until the fifteenth calendar day after landing. No later than 20 calendar days after landing, the owner or operator of the vehicle or the agent thereof shall notify Customs of any such merchandise or baggage for which entry has not been made. Such notification shall be provided in writing or by any appropriate Customs-authorized electronic data interchange system. Failure to provide such notification may result in assessment of a monetary penalty of up to $1,000 per bill of lading against the owner or operator of the vehicle or the agent thereof. If the value of the merchandise on the bill is less than $1,000, the penalty shall be equal to the value of such merchandise.

Appellant Shuangyang Li selected Answer Choice E and states that "[t]his answer does not provide enough answer to answer it correct." Appellant Li argues that, under 19 CFR 123.10(a), if the value of the goods was less than $1,000, the penalty would be less as well. Appellant Li points out that the question does not provide the value of goods and none of the answers provide values less than $1,000. Appellant Li asserts that, due to incomplete information, this the question needs to be thrown out and Appellant Li should receive credit.

The answer is found directly in the last two lines of 19 CFR 123.10(a). Pursuant to these sentences, failure to provide such notification may result in assessment of a maximum monetary penalty of up to $1,000 per bill of lading or the value of such merchandise if its value is less than $1,000 on the bill. While the question does not mention the value of merchandise covered by the bill, Answer Choice A is the only possible answer based on the text of 19 CFR 123.10 because all other answer choices are above $1,000 (the maximum penalty under 19 CFR 123.10(a)).

The appeal for Question 14 is denied.

Analysis Enclosure
Page 4

Analysis Enclosure
Page 5

Question 37:

What is the **CLASSIFICATION** of a foldable ping-pong game table consisting of an undersized ping-pong table surface? The object measures 5 feet (ft) long by 3 ft wide by 2.5 ft high when unfolded, and includes two paddles, a mesh net and two ping-pong balls.
    A. 9503.00.0073
    B. 9504.20.6000
    C. 9504.30.0040
    D. 9506.40.0000
    E. 9506.99.6080

The correct answer is D.

Analysis:

Question 37 required examinees to identify the classification of a ping-pong game table. Appellant Shuangyang Li selected Answer Choice E, which is incorrect.

Answer Choice D is correct per EN 9506(B)(4), which provides: "Requisites for other sports and outdoor games (other than toys presented in sets, or separately, of heading 95.03), e.g.: (4) Articles and equipment for table-tennis (ping-pong), such as tables (with or without legs), bats (paddles), balls and nets."

Appellant Li argues that a ping-pong table and table-tennis are not the same, and therefore cannot be classified under 9506.40.0000, HTSUS. However, EN 9506(B)(4) specifically states that table-tennis and ping-pong are the same for the purposes of classification. Therefore, the ping-pong table is classifiable under heading 9506.40.0000, HTSUS, which specifically provides for articles and equipment for table tennis.

The appeal for Question 37 is denied.

Analysis Enclosure
Page 6

Question 38:

What is the **CLASSIFICATION** of a book of crossword puzzles? The book measures 6 inches (in) by 9 in, is softcover, and contains 75 pages of pre-printed crossword puzzles labeled as appropriate for adults.

    A. 4901.99.0093
    B. 4901.99.0092
    C. 4903.00.0000
    D. 9503.00.0090
    E. 9503.00.0013

The correct answer is D.

Analysis:

Appellant Shuangyang Li selected Answer Choice A, which is incorrect.

Classification of goods under the HTSUS is governed by the General Rules of Interpretation (GRI). GRI 1 provides that classification shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes. In the event the goods cannot be classified solely based on GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs 2 through 6 may then be applied in order.

When, upon first impression, merchandise is classifiable under two or more headings or subheadings of the HTSUS, we apply GRI 3 to resolve the classification.

GRI 6 provides that for legal purposes, classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes, with the understanding that only subheadings at the same level are comparable.

Per a GRI 1 analysis, Appellant Li should have reviewed Note 1(c) to Chapter 49, which clearly states that "[p]laying cards or other goods of chapter 95" are not covered by Chapter 49. As such, Appellant Li should then have looked to the headings, chapter notes, and section notes of Chapter 95 to determine whether the book of crossword puzzles is precluded from classification under the headings of Chapter 95 and, therefore, viable for classification in a heading of Chapter 49. No such preclusion exists in the chapter or section notes and heading 9503 explicitly provides for "puzzles of all kinds." Therefore, viable classification in heading 9503 precludes classification in any heading of Chapter 49. Within heading 9503 Appellant Li should have noted that classification under subheading 9503.00.0013 requires the article at issue to be "Children's products" as defined in 15 USC 2052:" and "Inflatable toy balls, balloons and punch balls, of rubber." The puzzle book is explicitly appropriate for adults and is not an inflatable rubber ball. The only appropriate classification is under 9503.00.0090, Answer Choice D.

Appellant Li performed a GRI 3 analysis. Classification under GRI 3 is only proper when classification under GRI 1 is not possible. This article is classifiable under GRI 1 because there is no obvious conflict between equally viable headings. Classification under any heading of Chapter 49 is precluded by Note 1(c) if the article is a good of Chapter 95. Upon an initial

Analysis Enclosure
Page 7

examination based on GRI 1, an article cannot be classifiable under both a heading of Chapter 49 and a heading of Chapter 95, so GRI 3 was not required to resolve the issue nor properly applied.

The appeal for Question 38 is denied.

Analysis Attachment
Page 8

Question 42:

Best Seafood Import Company is entering a product called "Bonito del Norte" from Spain.  The fish is in pieces, packaged in glass jars and is invoiced as "Bonito del Norte, White Tuna in Olive Oil."  The documents provided include National Oceanic and Atmospheric Administration (NOAA) Form 370 "Fisheries Certificate of Origin", which lists "Thunnus Alalunga in Oil" under the "Description of Fish" section, and a Captain's Statement stating that no dolphins were harmed during the catch. What is the **CLASSIFICATION** of this product?

    A.  0302.31.0000
    B.  1604.14.1091
    C.  1604.14.2259
    D.  1604.14.7000
    E.  1604.19.2500

The correct answer is B.

Analysis:

Appellant Shuangyang Li selected Answer Choice D, which is incorrect.  Subheading 1604.14.7000, HTSUS, provides for "Prepared or preserved fish; caviar and caviar substitutes prepared from fish eggs: Fish, whole or in pieces but not minced: Tunas, skipjack tuna and bonito (Sarda spp.): Bonito (Sarda spp.): In oil."  Though the product name is "Bonito del Norte," a closer reading of the Facts reveals that the fish is neither bonito nor of the Sarda species.  The "Description of Fish" is listed as "Thunnus Alalunga in Oil" and not bonito, as contemplated by the Harmonized Tariff Schedule.  Therefore, the product cannot be classified as bonito under subheading 1604.14.70, HTSUS.

The appeal for Question 42 is denied.

Analysis Enclosure
Page 9

Question 44:

What is the **CLASSIFICATION** for a 1,080 pixel high-definition digital camera with an interchangeable lens and three-inch liquid crystal display (LCD) that captures both still images and moving images?

    A. 8519.89.3000
    B. 8525.80.4000
    C. 8525.80.5015
    D. 8525.80.5050
    E. 8527.12.0000

The correct answer is B.

Analysis:

Statistical reporting number 8525.80.4000, HTSUS, provides the following:

> Transmission apparatus for radio-broadcasting or television, whether or not incorporating reception apparatus or sound recording or reproducing apparatus; television cameras, digital cameras and video camera recorders: Television camera, digital cameras and video camera recorders: Digital still image video cameras.

The Facts dictate the article is a digital camera and, as such, it is classified in subheading 8525.80, HTSUS. Subheading 8525.80.40, HTSUS, provides for "digital still image video cameras." Question 44 indicates that the subject merchandise "…captures both still images and moving images." The term "digital still image video camera" clearly indicates the ability to capture still images while also functioning as a video camera. Therefore, the camera is properly classified under statistical reporting number 8525.80.4000.

Appellant Shuangyang Li argues the digital camera is classified under subheading 8525.80.50, HTSUS. Appellant Li notes the digital camera is not a television camera, which is only for video. Furthermore, Appellant Li contends digital still image video cameras are only for capturing still images. Finally, Appellant Li points out the digital camera is not a camcorder, which is mostly used for video, so it must be in the "basket" provision (i.e., subheading 8525.80.50, HTSUS).

The full language of the term "digital still image video cameras" does not describe a camera that can only take still image photographs, but also a video. As such, the digital camera at issue should be classified under the heading that accurately describes all its functions, which is 8525.80.40, HTSUS.

The appeal for Question 44 is denied.

Analysis Enclosure
Page 10

Question 54:

The new owner of a previously recorded trademark would like to continue the recordation with CBP. The trademark is for an item with a gray market counterpart the owner would like protection against based on physical and material differences. The following are all actions the owner must take to continue the recordation **EXCEPT**:

A. Pay a fee of $80.00 which covers all trademarks included in the application
B. State the basis for the asserted physical and material differences with particularity and competent evidence with summaries of the differences for publication in the Customs Bulletin
C. The identity of any parent or subsidiary company or other foreign company under common ownership (only for those with aggregate ownership of more than 40% of the business entity) and common control which uses the trademark abroad
D. Describe any time limit on the rights of ownership transferred
E. Submit a status copy of the certificate of registration certified by the U.S. Patent and Trademark Office showing the title to be presently in the new owner's name

The correct answer is C.

Analysis:

Under 19 CFR 133.2(d)(1), "common ownership means . . . more than 50 percent of the business entity;" the applicant is not required to provide the identity of all parents and subsidiaries having 40 percent ownership. Appellant Shuangyang Li selected Answer Choice A and argues that the question is invalid because it has multiple correct answers, including Answer Choices A, D, and E.

Appellant Li argues that Answer Choice A is correct because the application fee to record a trademark is $190. However, Question 54 specifies that the mark is "previously recorded." Accordingly, for the new owner to continue the recordation, "a fee of $80 [] covers all trademarks included in the application." 19 CFR 133.5.

Appellant Li also argues that Answer Choice D is correct because it "is not about trademark recordation." However, 19 CFR 133.5(b) explicitly requires a description of "any time limit on the rights of ownership transferred" in an application to record a change in ownership.

Appellant Li finally argues that Answer Choice E is correct because 19 CFR 133.3(a)(2) requires "[f]ive copies of this certificate." However, the regulation cited by Appellant Li governs a new application to record a trademark, and the question concerns a "new owner of a previously recorded trademark [who] would like to continue the recordation with CBP." The relevant regulation is 19 CFR 133.7(a), which, unlike Section 133.3(a), only requires a "status copy" and not "[f]ive copies."

The appeal for Question 54 is denied.

Analysis Enclosure
Page 11

Question 69:

In the case of merchandise covered by a finding under 19 CFR 12.42(f), the Commissioner of CBP advises the port director that the proof furnished under 19 CFR 12.43 does not establish the admissibility of the merchandise, and no proof has been timely furnished. What will the port director do with the merchandise for violation of 19 USC 1307?

A. Export the merchandise
B. Detain the merchandise
C. Admit the merchandise
D. Seize the merchandise
E. Add a 25% duty to the merchandise

The correct answer is D.

Analysis:

Appellant Li selected Answer Choice B and asserts that Question 69 does not provide a correct answer. Appellant Li did not advance any substantive argument as to why Answer Choice B is correct, but references 19 CFR 12.44(a) which provides, in relevant part:

> *Provided no finding has been issued by the Commissioner of CBP*
> under § 12.42(f) and the merchandise has not been exported within
> 3 months after the date of importation, the port director will
> ascertain whether the proof specified in § 12.43 has been submitted
> within the time prescribed in that section. If the proof has not been
> timely submitted, or if the Commissioner of CBP advises the port
> director that the proof furnished does not establish the
> admissibility, the port director will promptly
> advise the importer in writing that the merchandise is excluded
> from entry. Upon the expiration of 60 days after the delivery or
> mailing of such advice by the port director, the merchandise will
> be deemed to have been abandoned and will be destroyed, unless it
> has been exported or a protest has been filed as provided for in
> section 514, Tariff Act of 1930. (emphasis added).

Question 69 clearly states in the first sentence, "In the case of merchandise covered by a finding under 19 CFR 12.42(f)…" indicating that a finding has been issued, under which the merchandise falls. Further, the question states that "the Commissioner of CBP advises the port director that the proof furnished under 19 CFR 12.43 does not establish the admissibility of the merchandise, and no proof has been timely furnished." In this case, the disposition of the merchandise is clearly covered by 19 CFR 12.44(b), which provides in relevant part that, "[i]n the case of merchandise covered by a finding under part 12.42(f), if the Commissioner of CBP advises the port director that the proof furnished under part 12.43 does not establish the admissibility of the merchandise, … the port director *shall seize* the merchandise for violation of 19 USC 1307 and commence forfeiture proceedings."

Analysis Enclosure
Page 12


The appeal for Question 69 is denied.

RECEIVED & FILED

2024 NOV 21  P 1:16

U.S. COURT OF
INTERNATIONAL TRADE
OFFICE OF THE CLERK